UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

**CLARENCE ARCHIE BRIGGS**                                                                  **PLAINTIFF**

v.                                                                             **CIVIL ACTION NO. 3:06CV-P581-S**

**OFFICER LLOYD** *et al.*                                                                **DEFENDANTS**

### MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant Officer Lloyd's motion for summary judgment (DN 49). Plaintiff responded (DN 56), and no reply has been filed. The motion is ripe for review. For the following reasons, the Court will grant Defendant's motion for summary judgment.

### I.  STATEMENT OF FACTS

Some of the facts are in dispute. According to Plaintiff's verified complaint (DN 1) and deposition testimony (DN 49, Attach.), while incarcerated in the disciplinary segregation unit[1] of Louisville Metro Department of Corrections around 9:00 p.m. on August 3, 2006, Nurse Steadmon was checking Plaintiff's blood pressure. Officer Morgan was escorting the nurse. When the nurse was finished, Plaintiff began talking to her about an issue that occurred the night before. He was explaining to her that his blood pressure was 180/108 and that he believed he suffered a mild stroke which caused his left side and hand to go stiff. "[T]he nurse said why I was telling her that," and then, out of nowhere and without warning, the cell door slammed hitting Plaintiff in the back "real hard" causing him to throw his left hand up to catch him from hitting the frame where the sliding door closed. Plaintiff avers that Nurse Steadmon and Officer

---

[1] In the deposition, Plaintiff avers that "I put myself there." He explains that in the dorm where he was previously housed "you got a lot of young guys that's very disrespectful, and they call them young and aggressive. And these kind of -- these guys like to stay up all night long, slam domino."

Morgan were standing in front of him when the door closed; that he asked them if they saw it happen; and that "the nurse response was I have nothing to do with that." (DN 49, Dep., pp. 22, 35). At that point, and while Nurse Steadmon and Officer Morgan were walking away,[2] Plaintiff asked Defendant Officer Lloyd, who was in charge of the controls that night, why he hit him with the cell door. Officer Lloyd "got real nasty" and told Plaintiff to "step in." *Id.* at p. 21. Plaintiff again asked Officer Lloyd, "why did you hit me with the door?" *Id.* Officer Lloyd said, "'step in,'" "[a]nd then again he pushed the button like he was going to hit me with the door again, I stepped in, and asked to speak to a sergeant and a nurse." *Id.*

Defendant's account of what occurred on August 3, 2006, differs. He claims that he gave Plaintiff a warning before shutting the cell door and does not believe that he shut the cell door on Plaintiff. More specifically, in an unverified incident report, Defendant recounts the event as follows:

> At approximately 2040 I stated to I/M C. Briggs after he finished talking to Nurse T. Steadmon to step into his cell, briggs didn't comply with my directive. I began to close the door at that point Briggs stated "what are you trying to do shut the door on me". he was then given another directive to step into his cell. approximately 10 minutes later Briggs ask to speak with the Sergeant claiming his back was hit by the cell door. Sgt. Gilbert and Medical was notified. Nurse stated she found no sign of back injury.[3]

(DN 49, Ex. 2). In an affidavit, Defendant explains that:

> To open and close the [solid-front, pocket] door to any of the individual single cells that are on this walk, including inmate Briggs' cell, it is necessary to go to a panel that is located in the wall outside the East Walk. Using a key, I open the door covering the panel, and then manually crank the single door open and shut using a

---

[2]Later in the deposition, however, Plaintiff avers that the cell door hit him as Nurse Steadmon and Officer Morgan were walking away (DN 49, Dep., p. 35).

[3]In the incident report, Nurse House, LPN, reported that she was "called to assess inmate complaining of back pain; no apparent abrasions, bruising, or grimacing when palpated." (DN 49, Ex. 2).

2

>  crank key.  I did not look toward inmate Brigg's cell while I operated the crank key.
>  . . . I do not believe that I shut the cell door on inmate Brigg's back.

(DN 49, Ex. 3).

The remaining facts are undisputed.[4]  On the day following the incident, Plaintiff submitted a Sick Call Request complaining that his back was "hurting real real bad."  (DN 49, Ex. 7, p. 4).  Nurse Newman wrote: "unable to evaluate back pain, was unable to bend over [and] touch his toes, appeared to be very painful."  *Id.*  Thereafter, medical records reveal that Plaintiff submitted several Sick Call Slips throughout his incarceration at Metro Corrections complaining of continuing back pain as well as right hip pain and left hand pain and that he was prescribed ibuprofen and analgesic cream.[5]  *Id.* at pp. 5-10, 13.  He was initially seen by a physician on August 16, 2006, complaining of right hip and left hand pain.  The physician noted mild tenderness over the right hip and prescribed ibuprofen.  *Id.* at pp. 11-12.  X-rays were ordered.  On August 31, 2006, a radiologist noted that the x-ray of Plaintiff's left hand showed "no evidence of recent fracture" and concluded that "[n]o bony abnormality is detected.  However, if symptoms persist a follow up examination is recommended."  *Id.* at p. 18.  On that same date, the radiologist found the x-ray of Plaintiff's right hip to be a "negative study."  *Id.*  A physician's note on September 7, 2006, indicated that Plaintiff had complaints of back and left hand pain, and examination showed no deformity or swelling in back or hand and that Plaintiff ambulated

---

[4]While the facts themselves are undisputed, their legal significance, *i.e.*, the severity of the injury, is in dispute.  *See* Section III.

[5]For example, on August 8, Plaintiff complained of "sharp pain" in his back and left hand and reported that ibuprofen was not working; on August 24, he again complained of "sharp pain," and the nurse observed that he was "tender to touch" without bruising and that his "LL back area [was] firm"; and on September 8, he reported "sensational pain" in his back and left hand since the incident and the nurse noted, "No visible back injury noted . . . unable to evaluate back pain."

without difficulty. *Id.* at 14. On examination on September 27, 2006, "mild discomfort" was noted. Id. at 19. On October 25, 2006, a radiologist report indicates that "[t]here appears to be localized hypertrophic[6] changes in the lower lumbar area. No other abnormality is detected but the exam is not completely satisfactory." (DN 50, Ex. 7A). Plaintiff reports that he now has a permanent assignment to a bottom bunk.

Plaintiff filed a grievance regarding the incident, and, at the first response level, the incident was deemed an "accident." (DN 1, Attach.). Plaintiff filed an appeal claiming that the investigation was one-sided and that he had witnesses "that heard everything and will prove that this officer not once tell me [or] warn me that he was closing the Door."[7] *Id.* He received no response to the appeal. *Id.*

## II. SUMMARY-JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). The party moving for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The moving party's burden may be discharged by demonstrating that there is an absence of evidence to support an essential element of the nonmoving party's case for which he or she has the burden of proof. *Id.* Once the moving party demonstrates this lack of evidence, the

---

[6]Hypertrophy is "excessive development of an organ or part; specifically: increase in bulk (as by thickening of muscle fibers) without multiplication of parts." Merriam-Webster's Medical Dictionary.

[7]In his deposition, Plaintiff testifies that he has affidavits of the fellow-inmate witnesses that will prove that Officer Lloyd never warned Plaintiff that he was going to close the door, but Plaintiff never filed the affidavits in the record.

burden passes to the nonmoving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element essential to his case with respect to which he bears the burden of proof. *Id*. If the nonmoving party will bear the burden at trial on a dispositive issue, the nonmoving party must go beyond the pleadings and by his own affidavits, "or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted, citing former FED. R. CIV. P. 56(e)). If the record taken as a whole could not lead the trier of fact to find for the nonmoving party, the motion for summary judgment should be granted. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Where the nonmoving party bears the burden of proof at trial, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. The nonmoving party must do more than raise some doubt as to the existence of a fact; the nonmoving party must produce evidence that would be sufficient to require submission of the issue to the jury. *Lucas v. Leaseway Multi Transp. Serv., Inc.*, 738 F. Supp. 214, 217 (E.D. Mich. 1990). The moving party, therefore, is "entitled to a judgment as a matter of law because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof." *Id*. (internal quotation marks omitted). One of the principal purposes of summary judgment is to isolate and dispose of factually unsupported claims or defenses. *Id*. at 323-24.

## III. ANALYSIS

In the motion for summary judgment (DN 49), Defendant Lloyd argues that Plaintiff has no probative evidence to support a constitutional issue that presents a triable issue of fact. He contends that, even if a jury were to believe that the cell door shut on Plaintiff, Plaintiff has no evidence of a physical injury, other than his documented complaints to medical staff of pain (first in his back, then his left hand, then his lower left back pain, and then his right hip), to establish more than an alleged *de minimis* use of force and no probative evidence that Officer Lloyd purposefully closed the cell door on Plaintiff as a means of force to harm Plaintiff. Ultimately, claims Defendant, Plaintiff has offered no probative evidence that the conduct amounts to conduct "repugnant to conscience of mankind." He also argues that he is entitled to qualified immunity.

"[W]henever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 5 U.S. 8, 6-7 (1992). "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency always are violated." *Id.* at 9. Of course, not "every malevolent touch by a prison guard gives rise to a federal cause of action," *id.* at 9, and "*de minimis* uses of physical force" do not support a constitutional claim "provided that the use of force is not a sort 'repugnant to the conscience of mankind.'" *Id.* at 10 (citations and internal quotation marks omitted). Furthermore, "[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Bell v. Wolfish*, 441 U.S. 520, 548 (1979).

In evaluating an excessive-force claim, the court should consider the extent of injury suffered by an inmate in determining whether the use of force was wanton and unnecessary, although "[t]he absence of serious injury . . . does not end [the inquiry]." *Id.* at 7. Other relevant factors in evaluating an excessive-force claim include "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials,' and 'any efforts made to temper the severity of a forceful response.'" *Id.* (quoting *Whitley v. Albers*, 475 U.S. 312, 321 (1986)).

Plaintiff claims that Officer Lloyd acted "maliciously and sadistically" when he hit Plaintiff with the cell door. It is disputed as to whether the cell door actually hit Plaintiff. Even if the cell door did hit him, Plaintiff has failed to submit probative evidence establishing that Officer Lloyd acted "maliciously and sadistically."

In his deposition, Plaintiff offers the following explanation for believing that Officer Lloyd intentionally closed the cell door on him.

> Q       So why do you think he did – do you think he did it on purpose, or do you think he just wasn't paying attention to what he was doing?
>
> A       I feel, you know, some of them officers some in there sometime, I don't know if they got issues at home, but whatever, you know. Sometime you know, you know when a guy would like – you know how you just – that day – that day Officer Lloyd was pretty – you know, he wasn't smooth was he usually smooth. He's like mad at the world. I don't know. And I don't know – I don't know – I don't know why he hit me with the door.
>
> Q       But you think he did it on purpose.
>
> A       Yeah, he did it on purpose, though.
>
> Q       So why do you think he did it on purpose as opposed to being an accident?
>
> A       You know, them guys, they got – they got ways to do their authority ways, you know. And I – and I still don't understand why, you know, why he

7

>would do something to me cause I haven't did nothing to no one, you know. And I don't know – I don't know if it was just a way – I don't know why he hit me with the door.
>
>Q      But you want to conclude that he did it on purpose instead of it being an accident.
>
>A      I know he did it on purpose, but what got me was like, you know, I don't know why when I was asking him why he hit me with the door, just step in. You know, I asked why you hit me with the door. Step in. Then he act like he was going to do it again. So that's why I knew it was intentional.
>
>\* \* \* \* \*
>
>Q      But would that be – that wouldn't be unusual, though, if an officer's working the control panel, and he sees the nurse, he sees the officer walking away, why wouldn't he shut the door?
>
>A      As I said, again, he could see me in the doorway. Where I was at, he could, you know, Briggs, I'm going to close the door, as they always do. You know. We take showers, and they know when you in the cell and when you not in the cell. And you know, like I said, he hit me with the door, for whatever reason why he hit me with the door, it happened.

(DN 49, Dep., pp. 33-36).

Plaintiff thus claims that Officer Lloyd intentionally hit him with the door because Officer Lloyd is in a position of authority; was not acting "as smooth" as he normally did/was "mad at the world"; because after he hit Plaintiff with the door he twice warned him to step in the cell and then acted like he was going to push the button again; and "for whatever reason . . . it happened." Plaintiff's first theory – that Officer Lloyd is in a position of authority – is conclusory and speculative, and his second theory – that he was not as smooth as normal/was mad – is a nonspecific assertion and not supported by any statements from anyone else. As to his third theory – that after he was initially hit by the door, Officer Lloyd acted like he was going to push the button to close the door again – this action was taken, as acknowledged by Plaintiff,

8

only after Officer Lloyd twice told Plaintiff to step into his cell. These warnings do not suggest wanton, malicious, or sadistic behavior, and wide-deference should be accorded to a prison official attempting to maintain security on a disciplinary-segregation walk.

In *Hardy v. Vieta*, 174 F. App'x 923 (6th Cir. 2006), the Sixth Circuit reversed a grant of summary judgment in a similar case where a guard was sued for shutting a cell door on an inmate and causing a back injury. The Sixth Circuit concluded that the plaintiff "both sufficiently alleged, and provided evidence from which an inference can be drawn, that [the guard] wantonly inflicted harm upon him." *Id.* at 926. The evidence in that case, however, included sworn testimony from another inmate that (1) he heard the defendant guard, upon seeing plaintiff, "utter words indicating wantonness and premeditation" (the guard was heard saying, "watch what I do to this 'Mother F*****'" and "Here comes that Faggot Sitch [sic], watch this."); (2) he saw the guard "purposefully and intentionally push a steel door" on plaintiff; and (3) he "heard what sounded like the door hitting something, and then Defendant . . . [was] laughing as he left." *Id.* at 924, 926.

In stark contrast, Plaintiff has submitted no affidavit from any eye witness or any other probative evidence demonstrating that anyone actually saw Officer Lloyd at the control panel observing Plaintiff and intentionally shutting the door on him, that anyone heard Officer Lloyd utter any statement indicating that he was going to shut the door on Plaintiff, or that anyone heard what sounded like a cell door closing on Plaintiff. In his deposition, Plaintiff initially reports that both Nurse Steadmon and Officer Morgan were witnesses to the incident, standing in front of him when the cell door closed on him, (DN 49, Dep., pp. 21-22), but he later avers that

9

they were walking away from him when he was hit with the door.[8] *Id.* at p. 35. And regardless of whether they witnessed the event, Plaintiff has submitted no statements from them or any other witness, despite the provisions in the Federal Rules of Civil Procedure that permit a party to obtain information from a non-party. *See, e.g.*, Fed. R. Civ. P. 30, 31, 45. Moreover, even if Plaintiff had submitted affidavits of fellow inmates, they would not establish that Officer Lloyd intentionally shut the cell door on Plaintiff as Plaintiff concedes that none of the inmates were able to see Office Lloyd and because the only thing they allegedly "heard" was silence[9] (DN 49, Dep., pp. 30-32). No other evidence proffered by Plaintiff supports any malicious or sadistic conduct on Officer Lloyd's part.

Additionally, Plaintiff has not shown a significant or severe injury. While Plaintiff complains of continuing pain, no bruising or discoloration or other abnormalities of his back, hip or hand were observed; he was prescribed minor pain medication and an analgesic rub; and no acute injury was found on radiological testing. Plaintiff testified in his deposition that he never had any "run-ins" with Officer Lloyd (DN 49, Dep., p. 6). And, even if the cell door closed on Plaintiff, Officer Lloyd tempered the severity of the force by calling for a nurse and sergeant when requested by Plaintiff.

---

[8]Plaintiff avers, "As they was walking away, like I said when I was talking to her, as they walking away, I said, Whatever you do, please don't – and before I could even say what I said, that's when I was hit with the door, while I was telling her that, that's when I was hit with the door." (DN 49, Dep., p. 35).

[9]In the deposition, Plaintiff avers that "Well, [inmate Tony Woods] didn't see it, but he heard it. He heard what I'm saying Officer Lloyd never told me once to get inside the cell. . . But while I was in there, you know, these guys, Tony Woods, Leonard McElroy, had heard about it and told me, *That was dead wrong of him, Briggs; he not once told you to step in*. He never said – he never said nothing." (DN 48, Dep., p. 31). "They would heard that – you know, reason why I got the – reason why I wrote the guys down because they also heard Officer Lloyd never tell me once to step in." *Id.* at p. 32.

For the foregoing reasons, the Court concludes that Plaintiff has not demonstrated a genuine issue of material fact as to conduct that rose to the level of an Eighth Amendment violation. As such, as a matter of law, Defendant Officer Lloyd is entitled to summary judgment.

## IV.  ORDER

Accordingly, Defendant Officer Lloyd's motion for summary judgment (DN 49) is **GRANTED**. By separate Order, the Court will enter judgment in favor of Defendant and dismiss the action.

Date:


cc:     Plaintiff, *pro se*
        Counsel of Record
4411.005